Filed 12/21/22  P. v. Leon CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>JOSE GOMEZ LEON,<br><br>　　　　Defendant and Appellant. | B322696<br><br><br>(Fresno County<br>　Super. Ct. No. F16907319) |

　　　　APPEAL from a judgment of the Superior Court of Fresno County.  W. Kent Hamlin, Judge.  Affirmed.

　　　　Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　　Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein, Eric L. Christoffersen and Jennifer M. Poe, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * * * * * *

Defendant and appellant Jose Gomez Leon appeals from his conviction by jury of nine counts of aggravated sexual assault of a child and one count of committing a forcible lewd act upon a child. The victim was defendant's biological daughter who was under the age of 14 at the time the assaults occurred. Defendant raises numerous contentions of evidentiary error, instructional error, sentencing error and ineffective assistance of counsel.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged by amended information with 10 felony counts, all of which were alleged to have occurred during the period from July 23, 2014, through December 5, 2016: four counts of aggravated sexual assault (rape) of a child under the age of 14 by an individual more than seven years older than the child (Pen. Code, § 261, subd. (a)(2), § 269, subd. (a)(1); counts 1–4); two counts of aggravated sexual assault (sexual penetration) of a child under the age of 14 by an individual more than seven years older than the child (§ 269, subd. (a)(5), § 289, subd. (a)(1)(B); counts 5 & 6); two counts of aggravated sexual assault (oral copulation) of a child under the age of 14 by an individual more than 10 years older than the child (§ 269, subd. (a)(4), § 287, subd. (c)(2); counts 7 & 8); one count of aggravated sexual assault (sodomy) of a child under the age of 14 by an individual more than 10 years older than the child (§ 269, subd. (a)(3), § 286, subd. (c)(1); count 9); and one count of committing a forcible lewd act upon a child under the age of 14 (§ 288, subd. (b)(1); count 10).

### Testimony of the Victim

M., who was 16 years old at the time of trial in August 2019, testified about how defendant, her father, molested her for over two years. She said the abuse began in 2014 when she was

11 and did not end until December 5, 2016. The first time defendant abused M., they were alone in the house. Defendant touched her and put his fingers inside her vagina. M. said it was very painful. She was confused and scared and therefore remained quiet. Defendant told her not to tell anyone.

The second time, defendant took M. in his car and drove to a nearby field. M. said the car was gray in color but she could not recall the make or model. She said the assault was similar to the first time, but defendant pulled down her shorts and used his mouth and not just his hands. Defendant also touched her breasts. He again told M. not to tell anyone.

Over the next year, this type of assault happened "over and over," more than 10 times. Sometimes it would occur at home if no one else was home, but usually defendant would take M. in his car and park next to a field or orchard and assault her in the car.

Defendant told M. to take photographs of herself naked and text them to him. He showed M. pornographic videos so she would know how to pose. Defendant threatened to show the photographs to people if M. told anyone about what was going on. Defendant also told M. that if she told anyone what he was doing, it would be her fault if their family split up. He also threatened to touch her two younger sisters if she talked. M. said she felt great pressure to do what defendant wanted, so that he would not hurt anyone else whom she loved. M. wanted to protect her sisters and her mother because she knew how much her mom loved her dad. She said it was "like living, but not living at the same time."

About a year after the touching first started, defendant took M. to a hotel in Sanger. M. could not recall the name of the hotel but she remembered defendant picked her up early from school to take her there. When they got to the room, defendant

3

told her to undress.  He touched her breasts and repeatedly put his penis in her vagina which was very painful.  M. saw defendant ejaculate a white substance but she did not know what it was.  He cleaned it up from the bed with toilet paper and told her to get dressed and they went home.

This happened two more times at other hotels.  M. could not recall the names of the hotels.  Each time defendant took her out of school early, took her to the hotel and did what he did the first time.  When M. said she did not want him to touch her like that, defendant said it was normal, that it was even in the Bible.

Another day, M. recalled that defendant was in the bathroom at their home, shaving or doing something like that.  He called for M.  When she went in the bathroom to see what he wanted, she could tell he was drunk.  Defendant tried to force her to have sex with him.  She said no and defendant started to raise his voice.  M.'s brother heard them and came to the door asking what was going on, and defendant stopped.

On December 5, 2016, defendant came to M.'s soccer practice to pick her up.  She was wearing a shirt and gym shorts.  Defendant drove them to an orchard and parked the car.  He forced himself on her and raped her in the car like he had done at the hotels.  M. finally decided she was going to confide in someone about what defendant had been doing.

After they got home, M. took a shower and put her gym clothes in the laundry basket.  She then went to talk to C.G., a next-door neighbor and friend of the family, and confided in her that defendant was abusing her.  C.G. told M.'s mother, I.M.L., when she got home from work.  The police were called and several deputies from the Fresno County Sheriff's Office responded to the home.  They spoke with and took statements

4

from M., C.G. and I.M.L. M. was taken to Valley Children's Hospital in Madera to be examined.

M. also testified about an additional incident of abuse that she reported to the nurse who examined her at the hospital. She said defendant once tried to have anal sex with her. It was very painful and caused her to bleed. She was in pain for a couple of days afterward.

**Events Leading to Defendant's Arrest and Confession**

C.G. corroborated M.'s testimony that in December 2016, M. told her defendant was sexually abusing her. C.G. told I.M.L. about her conversation with M.

I.M.L. confirmed her conversation with C.G. I.M.L. spoke with M. when she got home from school. M. cried as she explained what defendant had been doing and told her mother she did not want to live. M. told her mother that defendant had just abused her the day before (December 5). I.M.L. told M. she had done nothing wrong, she was just a child. I.M.L. was angry and upset that she had not realized what was going on and had not protected her daughter.

I.M.L. confronted defendant. He denied he had done anything wrong. She threw his car keys at him and told him to leave. She also called the sheriff's office and reported the abuse.

Detective Leticia Baylon of the Fresno County Sheriff's Office responded to the family home with Deputy Stearns and took statements from M., I.M.L. and C.G. M. told Detective Baylon about the abuse defendant had subjected her to since she was 11 years old. Detective Baylon recalled that M. said the abuse occurred in multiple different locations over two years, including different hotels in Sanger and Fresno, various nearby fields, and the family home.

5

Detective Baylon took possession of M.'s gym shorts that she had been wearing on December 5 when defendant assaulted her in the car. The shorts were booked into evidence.

The next day (December 7), defendant returned to the house. I.M.L. told him she had called the police. She then contacted the sheriff's office and told them defendant was at the house. Detective Baylon, Deputy Stearns, Sergeant Pugliese and Detective Virginia Rodriguez went to the house. When they arrived, they knocked on the door and announced who they were in both English and Spanish.

After receiving no response, they started to go inside to search for defendant. I.M.L. had given them a key to the home and her permission to enter if defendant did not answer the door. I.M.L. had left to be with her children who were at her mother's home. Sergeant Pugliese, who had gone around to the back of the home, reported on his radio there was a male running out the back door. When Detective Baylon got to the backyard, she saw defendant standing with Sergeant Pugliese. Defendant was "swaying back and forth" and smelled of alcohol. He was placed under arrest and taken to the sheriff's office in Fresno. One of the deputies located defendant's gray car parked several doors down from the home.

Several hours after defendant was arrested, Detective Jesse Gloria and his partner, Detective Rodriguez, interviewed defendant. The interview was conducted in Spanish and videotaped. It began at 9:37 p.m. and lasted a little over an hour, ending just before 11:00 p.m.

At the beginning of the interview, Detective Gloria separately identified each of defendant's rights under *Miranda v. Arizona* (1966) 384 U.S. 346 and asked defendant if he understood those rights. Defendant said yes. Detective Gloria

6

then asked defendant if he was willing to waive those rights and talk with them, and defendant again answered yes. The videotape of the interview was played for the jury during the testimony of Detective Gloria, and an English language translation was provided to the jury. The parties stipulated the video and English translation were accurate.

Detective Gloria testified defendant did not show any obvious signs of intoxication at the time of his interview. He said defendant was initially a little defensive and evasive, but soon thereafter engaged with the detectives in a normal conversational manner. He did not seem confused or have difficulty answering questions.

For the first few minutes of the interview, they discussed defendant's work history, marital status and children. Defendant said he had been living in the United States for about six years and usually worked in the fields. He was, at the time, working at a local ranch.

When defendant was asked if he knew why he had been arrested, he said his wife I.M.L. had accused him the day before of touching M. inappropriately and kicked him out of their home. Defendant said he assumed that was what they wanted to talk to him about. Defendant said several times that while M. was a good daughter, she must be lying because he had done nothing wrong. The detectives told him his DNA was found on M.'s clothing and it would be better for him if he told the truth because it would look worse for him in court if he was shown to be a liar. Detective Rodriguez also said there was other evidence in addition to DNA supporting M.'s statement, including video evidence from the hotels he took her to and evidence he took her out of school early several times. As the interview went on, the detectives repeated several times that it would be better for

defendant to tell the truth, that they understood that people sometimes make mistakes.

After denying several times that any improper touching occurred and repeatedly claiming M. often lied, defendant admitted he had touched M. once when she was 11 or 12 years old. But he said M. had agreed to it and she did not think it was wrong. Defendant explained he picked up M. from school and while they were parked in the car, he touched her vagina with his hand, but nothing else happened.

Defendant then admitted that on another day he took M. to a hotel in Sanger. He said he touched M. with his hands, but they did not have sex and he never used his penis. Defendant later admitted he may have put his penis near her body, but never inside her, because the one time he tried to do so, M. said it hurt so he stopped. Defendant reiterated that he never did anything that M. did not agree to. He said he knew she was "underage" but "she was in agreement."

Defendant also admitted he took M. to a motel in Fresno. He said nothing happened that day because M. said she was not ready to have sex and defendant "always" told her that if she was not ready, that was fine and he never forced her.

Defendant said M. sometimes asked him to touch her and would send him pictures, but he knew he was the adult and should have stopped it from happening. Defendant said the touching started because M. was the one who tried to touch him initially. He said the touching incidents happened maybe a total of 10 times.

Towards the end of the interview, Detective Gloria told defendant he did not believe defendant had told them everything, that he believed M. was being truthful about everything that had occurred, and he would give defendant one more chance to

explain everything in full.  Detective Gloria said, "[y]ou can fix your heart right now, or keep hurting for the rest of your life.  This is your chance to help yourself, and help your daughter that's the only thing you can do now."  Defendant responded by saying there was nothing else to say because "I didn't do anything wrong."

**Other Evidence**

 The vice principal for the Sanger Unified School District, where M. was a student, testified that school records showed defendant came to M.'s school on four days in the fall of 2016 and took M. out of school early.

Forensic testing of the gym shorts M. had worn on December 5, 2016, the day of the last assault, tested positive for seminal fluid and a DNA match to defendant was confirmed.

Dr. Anna Washington, a licensed psychologist at the University of California at Davis, testified.  She described her work at the University's Child Adolescent Abuse Resource Center which consists primarily of counseling children who are the victims of sexual abuse.  Dr. Washington said she did not interview or meet with M., but rather was providing testimony regarding Child Sexual Abuse Accommodation Syndrome (CSAAS) generally.  She explained how children who suffer sexual abuse often exhibit certain behaviors and difficulty reporting the abuse.  She said CSAAS is characterized by five components, each of which has certain associated behaviors: secrecy, helplessness, entrapment and accommodation, delayed unconvincing and conflicting disclosures, and retraction.

**Defendant's Testimony**

Defendant testified in his own defense.  He denied touching M. inappropriately in any manner.  He said he had picked up M. early from school several times but it was only to take her to the

9

eye doctor because she was having trouble with one of her eyes. He denied it had anything to do with taking M. to hotels to have sex. Defendant also denied taking naked photographs of M. or showing her pornography. He said the only explanation for his DNA being on M.'s gym shorts was because when he had sex with his wife, he would ejaculate outside of her because he did not want her to get pregnant again. When he did that, he would grab a piece of nearby clothing to clean up afterward. He denied threatening M. in any way to keep quiet. Defendant also said he did not try to flee from the police and that he was extremely intoxicated when he was arrested. He had had a lot of beer and had also taken drugs which he referred to as "crystal." He had no idea why he admitted to anything during the interview. He claimed to feel intense pressure from the detectives to say things that did not occur. Defendant also said that where he came from you have to talk to the authorities or "bad things" can happen, and that is "possibly" why he started to admit to things that did not actually happen.

### The Verdict and Sentencing

The jury found defendant guilty as charged. The court sentenced defendant to an eight-year midterm on count 10 and nine consecutive terms of 15 years to life on each of counts 1 through 9 for a total sentence of eight years, plus 135 years to life. The court awarded defendant 1,182 days of presentence custody credits. The court imposed the following fines and fees: a maximum restitution fine of $10,000 (Pen. Code, § 1202.4, subd. (b)), court operations assessments totaling $400 (§ 1465.8, subd. (a)(1)), and court facilities assessments totaling $300 (Gov. Code, § 70373). The court imposed and suspended a parole revocation fine. Defendant stipulated to victim restitution in the amount of $1,460.87.

This appeal followed. After briefing was complete, this matter was transferred from the Fifth District (F080091) to this court for argument and disposition and assigned case No. B322696.

## DISCUSSION

### 1. The Admission of Defendant's Pretrial Confession

Defendant contends his pretrial confession to the investigating detectives should have been suppressed as involuntary given his intoxication, level of education and unfamiliarity with the criminal justice system, combined with the coercive interrogation tactics used by the officers. He says the admission of his statement deprived him of his constitutional right to due process. We are not persuaded.

#### a. Background

Defendant moved in limine to suppress his pretrial statement on the grounds he was intoxicated, uneducated and an unsophisticated recent immigrant who did not understand the significance of what was happening and did not make a knowing and voluntary waiver of his rights under *Miranda*.

The court denied the motion, explaining that in the videotaped interview, defendant did not display any obvious signs of intoxication like slurred speech or confusion. The court said it had "really looked" at defendant's conduct throughout the interview and there was no indication the detectives pressured defendant. They spoke to defendant in Spanish, and clearly and slowly identified each *Miranda* right before asking him if he understood his rights and was willing to waive them. The court said defendant did not appear confused or puzzled by any of the detectives' questions, but rather responded to them in a manner that seemed to indicate he wanted to tell his side of the story.

11

### b. Applicable law

"An involuntary confession may not be introduced into evidence at trial. [Citation.] The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. [Citations.] In determining whether a confession was voluntary, ' "[t]he question is whether defendant's choice to confess was not 'essentially free' because his [or her] will was overborne." ' [Citation.] Whether the confession was voluntary depends upon the totality of the circumstances. [Citations.] ' "On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review." ' " (*People v. Carrington* (2009) 47 Cal.4th 145, 169 (*Carrington*).)

### c. No evidence confession was not voluntary due to intoxication.

"Our Supreme Court 'has repeatedly rejected claims of incapacity or incompetence to waive *Miranda* rights premised upon voluntary intoxication or ingestion of drugs, where, as in this case, there is nothing in the record to indicate that the defendant did not understand his rights and the questions posed to him.' " (*People v. Debouver* (2016) 1 Cal.App.5th 972, 978; see also *People v. Maury* (2003) 30 Cal.4th 342, 411 (*Maury*) [in the absence of state coercion, a "defendant cannot complain that any self-induced intoxication rendered his statements involuntary"].)

Like *Debouver*, there is nothing in the record here to indicate defendant's will was overborne or that his confession was not voluntary due to intoxication. Detective Gloria testified that defendant was interviewed several hours after his arrest and that defendant did not exhibit any signs of intoxication at that time.

The interview was conducted entirely in Spanish, defendant's first language. Defendant answered the detectives' questions directly and without any apparent difficulty. Defendant did not appear confused or ask any questions when his *Miranda* rights were explained to him or when Detective Gloria asked if he was willing to waive his rights.

Given the totality of circumstances, we conclude substantial evidence supports the trial court's findings and we agree defendant's statement was voluntary and properly admitted. (*People v. Boyette* (2002) 29 Cal.4th 381, 412 [testimony from interviewing officers that the defendant understood his rights and "did not seem mentally slow" was substantial evidence supporting trial court's decision that statement was voluntary].)

### d. Coercive interrogation tactics

Defendant also argues the detectives used inherently coercive interrogation tactics, such as lying about DNA results. However, defendant did not raise this issue in the trial court and any objection has therefore been forfeited.

In any event, the record demonstrates the detectives did not use any tactics or techniques that denied defendant due process. Once a suspect has been properly advised of his *Miranda* rights, as was the case here, " 'he [or she] may be questioned freely so long as the questioner does not threaten harm or falsely promise benefits. Questioning may include exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect.' " (*Carrington*, *supra*, 47 Cal.4th at p. 170.)

The questioning by the detectives here included, as Detective Gloria conceded in his testimony, some deception

13

regarding the existence of certain evidence. "Deception does not undermine the voluntariness of a defendant's statements to the authorities unless the deception is ' " 'of a type reasonably likely to procure an untrue statement.' " ' " (*People v. Williams* (2010) 49 Cal.4th 405, 443; accord, *Maury, supra*, 30 Cal.4th at p. 411.) It is a permissible interview tactic for an officer to imply that he knows more or has evidence tending to show more than it does. Such deception is not reasonably likely to procure an untrue statement. (*People v. Jones* (1998) 17 Cal.4th 279, 299.)

Both detectives also encouraged defendant to tell the truth and urged that he would feel better in the long run if he did. But neither detective threatened defendant, nor promised leniency in exchange for a confession. When law enforcement officers "describe the moral or psychological advantages to the accused of telling the truth, no implication of leniency or favorable treatment at the hands of the authorities arises." (*Carrington, supra*, 47 Cal.4th at p. 172.)

Defendant's contention his trial counsel was ineffective for failing to raise this argument below is without merit.

e.     **Failure to redact statement**

Defendant further contends his trial counsel was ineffective in failing to seek redaction of his statement after the court ruled the statement was admissible.

Defendant has a heavy burden to establish ineffective assistance on direct appeal. Defendant must demonstrate "both that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings." (*People v. Cudjo* (1993) 6 Cal.4th 585, 623, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687–696; accord, *People v.*

*Ochoa* (1998) 19 Cal.4th 353, 414.)  And where, as here, "the appellate record does not reveal whether counsel had a legitimate reason for a litigation choice, we generally reserve consideration of any ineffective assistance claim for possible proceedings on petition for writ of habeas corpus."  (*People v. Snow* (2003) 30 Cal.4th 43, 95; accord, *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.)

Defendant says his counsel should have asked to redact Detective Gloria's comment that he believed M.'s statement that defendant had sexual relations with her 16 to 17 times over the course of more than two years.  Detective Gloria then told defendant he did not believe defendant had told him everything yet, "you can see it in your face."

Defendant has not established either element of an ineffective assistance claim.  Defendant has not shown it is reasonably probable he would have obtained a more favorable verdict if counsel had sought to redact these portions of the interview.  The statements by Detective Gloria came at the end of the interview.  Defendant had already admitted he had committed multiple sexual acts with M., acts that were largely consistent with M.'s testimony and the other evidence the jury had already heard.  A reasonable jury would not have been unduly influenced by these brief statements and would have recognized them for what they were, Detective Gloria's final effort to get defendant to explain additional details.

**2.     The CSAAS Evidence**

Defendant raises numerous arguments related to the CSAAS evidence presented by the prosecution through its expert, Dr. Anna Washington.  None of the arguments has merit.

**a.     Admission of CSAAS evidence**

Defendant contends that as a matter of policy, CSAAS evidence should not be admissible for any purpose.  However, more than 30 years ago in *People v. McAlpin* (1991) 53 Cal.3d 1289, our Supreme Court held that while CSAAS evidence is not admissible to prove a victim has in fact been sexually abused, *it is admissible* " 'to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' "  (*Id*. at p. 1301.)  *McAlpin* remains the law in this state.  Courts of this state routinely recognize "the well-established relevance, necessity, reliability, and importance of [CSAAS] evidence."  (See, e.g., *People v. Munch* (2020) 52 Cal.App.5th 464, 472 (*Munch*).)

Dr. Washington testified consistently with the limited parameters set forth in *McAlpin*.  She did not meet with or interview M. or state any opinions about M.'s testimony or credibility.  Dr. Washington only described CSAAS generally, set forth its various components, and described it as a theoretical framework used to dispel some of the common myths surrounding child sexual abuse and how children react to being abused.

Defendant acknowledges *McAlpin* but urges us to rely on out-of-state authority to conclude, contrary to *McAlpin*, that CSAAS evidence is categorically inadmissible.  We decline to do so.  We are bound to follow Supreme Court precedent.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

16

### b.     CALCRIM No. 1193

Defendant next contends that CALCRIM No. 1193 misstates the law regarding CSAAS evidence and allowed the jury to improperly consider the evidence to find that M. had in fact been sexually abused instead for the limited purpose allowed by *McAlpin*.

Defendant concedes he did not object to CALCRIM No. 1193 in the trial court.  The contention has therefore been forfeited.  In any event, we are not persuaded CALCRIM No. 1193 invites the jury to misuse CSAAS evidence in the ways defendant suggests.  The instruction does not misstate the law. (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 176; *Munch, supra*, 52 Cal.App.5th at p. 474; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503–504.)

### c.     Cross-examination of Dr. Washington and Nurse Janie Salazar

Defendant contends his counsel was ineffective in cross-examining Dr. Washington, the CSAAS expert, and Ms. Salazar, the nurse who performed the sexual assault examination of M.

In cross-examining Dr. Washington, defense counsel elicited negative testimony regarding false allegations of sexual abuse.  The testimony on this point was minimal.  When asked, Dr. Washington said that in her experience, false allegations by children were rare.  She believed most allegations of false testimony by children were asserted by adults in custody disputes.

In cross-examining Ms. Salazar, defense counsel pursued a line of questions about the concept of force in sexual assaults and whether the size of an adult penis would necessarily involve force upon a child.  Ms. Salazar generally agreed, but also testified

more generally about whether force will result in trauma and when an examination is performed relative to the assault.

As we already explained *ante*, defendant has a heavy burden to establish ineffective assistance on direct appeal. This is particularly true when it comes to litigation tactics like how to cross-examine witnesses. " 'Even where defense counsel may have " 'elicit[ed] evidence more damaging to [defendant] than the prosecutor was able to accomplish on direct" ', we have been 'reluctant to second-guess counsel' where a tactical choice of questions led to the damaging testimony." (*People v. Williams* (1997) 16 Cal.4th 153, 217, citations omitted.)

We find no basis, on this record, to conclude defense counsel had no valid reason to question Dr. Washington on false allegations. As for the questioning of Ms. Salazar, defense counsel successfully established that her examination of M. revealed no signs of physical trauma, notwithstanding the testimony from M. that defendant had raped her in the car two days earlier.

Defendant has not established both elements of ineffective assistance regarding the cross-examination of these two witnesses.

### 3. The Flight Instruction

Defendant contends it was prejudicial error to instruct on flight because there was insufficient evidence to support the instruction. Defendant says the evidence showed only that he left the family home because his wife had thrown him out. We disagree.

Penal Code section 1127c requires the trial court to instruct on flight where evidence of flight is relied upon as tending to establish guilt. The statute provides in relevant part that "the court shall instruct the jury substantially as follows: [¶] The

flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

The jury was instructed with CALCRIM No. 372 which is derived from the statutory language:  "If the defendant fled or tried to flee immediately after the crime was committed or after he was accused of committing the crime, that conduct may show that he was aware of his guilt.  If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct.  However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."  (See *People v. Paysinger* (2009) 174 Cal.App.4th 26, 32 [rejecting constitutional challenge to CALCRIM No. 372].)

" ' "An instruction on flight is properly given if the jury could reasonably infer that the defendant's flight reflected consciousness of guilt, and flight requires neither the physical act of running nor the reaching of a far-away haven." ' " (*People v. Abilez* (2007) 41 Cal.4th 472, 522.)  It does not require evidence that the defendant knew criminal charges had been filed, nor is there any " 'defined temporal period within which the flight must be commenced . . . .' " (*People v. Leon* (2015) 61 Cal.4th 569, 607.)

Here, Detective Baylon testified about the events that occurred on the day they went to the family home to arrest defendant.  She testified that after a knock and announce did not result in anyone answering the front door, Sergeant Pugliese reported over his radio that someone was running out the back door of the home.  When Detective Baylon and Deputy Stearns reached the backyard, they found Sergeant Pugliese with

19

defendant.  Furthermore, defendant admitted, in his pretrial statement, he was aware of his daughter's accusations, that his wife had told him the detectives wanted to speak to him, and that when they came to the house he did think about fleeing for a "moment."  This evidence supports instructing with CALCRIM No. 372.  As the instruction explains, it was for the jury to resolve the meaning and import of defendant's actions.

**4.     Cumulative Error**

Defendant contends the combined effect of the errors by the court and his counsel during trial violated his constitutional right to due process.  We have not found any prejudicial error.  There is, therefore, no cumulative prejudice warranting reversal. (*People v. Lewis* (2001) 25 Cal.4th 610, 635.)

**5.     The Imposition of Fines and Fees**

Defendant contends the court violated his rights to due process by imposing fines and fees without any evidence of his ability to pay.  Relying primarily on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, defendant argues it violated due process for the trial court to impose the $10,000 maximum restitution fine, the $400 court operations fee, and the $300 court facilities assessment without an evidentiary showing by the People of his ability to pay.  Defendant concedes he did not object on this ground below, even though the sentencing hearing was held more than eight months after the *Dueñas* decision was issued.

The issue has been forfeited.  (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1155 [finding forfeiture where no objection raised in trial court to imposition of court operation assessment, criminal conviction assessment and restitution fine]; see also *People v. Avila* (2009) 46 Cal.4th 680, 729 (*Avila*) [finding forfeiture where the defendant failed to object to imposition of

restitution fine under Pen. Code, former § 1202.4 based on inability to pay].)

In any event, defendant's contention lacks merit. The court imposed the maximum restitution fine of $10,000 pursuant to Penal Code section 1202.4. Section 1202.4, subdivision (c) states that a defendant's inability to pay is not a compelling and extraordinary reason to refuse to impose the fine, but inability to pay "may be considered only in increasing the amount of the restitution fine in excess of the minimum fine [of $300]." This language was in the statute well before *Dueñas* was issued. The defendant bears the burden of demonstrating his or her inability to pay and a separate hearing for the restitution fine is not required. (§ 1202.4, subd. (d).) Irrespective of *Dueñas*, it was incumbent on defendant to have objected to the imposition of a restitution fine greater than $300 and to demonstrate to the court why a greater amount should not be imposed. He did not do so. (*Avila, supra*, 46 Cal.4th at p. 729.)

As for the $400 court operations fee, and the $300 court facilities assessment, the court did not err in concluding defendant could pay those mandatory fees from prison wages. The record shows defendant was in his early 30's and nothing suggests he suffered from any physical disability. The court could reasonably infer defendant will have the opportunity to earn prison wages. (*People v. Lowery* (2020) 43 Cal.App.5th 1046, 1060.)

**6.     Cruel and Unusual Punishment**

Defendant contends his 143-year sentence, which is effectively a sentence for the remainder of his life, is cruel and unusual punishment within the meaning of both the California and United States Constitutions.

21

Defendant does not make a purely legal challenge that the mandatory consecutive sentencing scheme of Penal Code section 667.6 violates the constitutional provisions against cruel and unusual punishment. That argument has been rejected. (*People v. Preciado* (1981) 116 Cal.App.3d 409, 412 [rejecting Eighth Amendment challenge to mandatory consecutive sentencing requirement set forth in § 667.6, subd. (d)].)

Defendant makes a factual argument that the statutory scheme as applied to him resulted in a grossly disproportionate sentence. He focuses on the fact that he had no criminal record and that there was no evidence of physical violence in the commission of the offenses, only duress. Defendant did not raise this argument in the trial court, and the contention has therefore been waived. (See, e.g., *People v. Russell* (2010) 187 Cal.App.4th 981, 993 (*Russell*); *People v. Norman* (2003) 109 Cal.App.4th 221, 229.)

Even if we were to reach the merits, we would reject the argument. "A sentence violates the state prohibition against cruel and unusual punishment (Cal. Const., art. I, §§ 6, 17) if ' "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience." ' [Citations.] [¶] A sentence violates the federal Constitution if it is 'grossly disproportionate' to the severity of the crime. (U.S. Const., 8th & 14th Amends. . . .)" (*Russell*, *supra*, 187 Cal.App.4th at p. 993, citations omitted.)

As defendant concedes, sexual assault of a minor is one of the most serious criminal offenses in our penal system. Over a period of two years, defendant engaged in repeated acts of sexual assault, including rape, oral copulation and sodomy, against his own daughter who was just 11 and 12 years old at the time. Defendant's sentence does not shock the conscience, nor is it grossly disproportionate to the severity of the multiple felony

crimes for which he was found guilty. (*People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 531–532 [rejecting claim that consecutive prison terms totaling 129 years pursuant to Pen. Code, § 667.6, subd. (d) for 25 separate sex offenses involving a minor victim constituted cruel and unusual punishment].)

Given the applicable law discussed above, we reject defendant's contention his trial counsel was ineffective for failing to raise this objection at the sentencing hearing.

## 7. Consecutive Sentencing

In supplemental briefing, defendant raised multiple claims of error regarding the court's imposition of consecutive sentencing pursuant to Penal Code sections 269, subdivision (c) and 667.6, subdivision (d). Defendant contends the court applied an incorrect legal standard in determining whether the charged acts occurred on separate occasions, the evidence was insufficient to support a finding the charged acts occurred on separate occasions, and the "separate occasions" finding by the court violated his right to a jury trial under both the California and United States Constitutions. We reject all of these arguments.

Penal Code section 269, subdivision (c) provides that "[t]he court shall impose a consecutive sentence for each offense that results in a conviction under this section if the crimes involve . . . the same victim on separate occasions as defined in subdivision (d) of Section 667.6."

Penal Code section 667.6, subdivision (d)(2) provides that a court, in resolving whether crimes against a single victim occurred on separate occasions, "shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon the defendant's actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the

23

defendant lost or abandoned the opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."

The court did not apply an incorrect legal standard. The court cited the relevant language of Penal Code section 667.6, subdivision (d). The court said, "[t]hese crimes were committed against a single victim, but they were on separate occasions[,] during the commission of each case [*sic*] and between the commission of these crimes, this defendant had an opportunity to reflect on his actions and, nevertheless, continued to persist in his sexually assaultive behavior and, therefore, the court finds a separate consecutive term should be imposed for each violent offense under Section 667.6(d)."

The evidence, which we described at length above, amply supports the trial court's finding that the 10 offenses occurred on separate occasions within the meaning of the statute.

As for defendant's constitutional argument, both the California Supreme Court and United States Supreme Court have rejected the argument that vesting the trial court with the discretion to choose between concurrent and consecutive sentencing offends the constitutional right to a jury trial. (See *People v. Black* (2007) 41 Cal.4th 799, 806 & *Oregon v. Ice* (2009) 555 U.S. 160, 164.)

Our Supreme Court is currently considering the issue of whether the requirement of mandatory consecutive sentencing embodied in Penal Code section 667.6, subdivision (d) complies with the Sixth Amendment to the United States Constitution. (*People v. Catarino* (Oct. 14, 2021, D078832) [nonpub. opn.], review granted Jan. 19, 2022, S271828.) Pending further guidance from the Supreme Court on this issue, we will follow *Black* and *Ice*.

24

In any event, assuming for the sake of argument there was error in the court's imposition of consecutive sentences, it was harmless beyond a reasonable doubt. (See *People v. French* (2008) 43 Cal.4th 36, 52–53 [failure to submit sentencing factor to jury is not structural error and does not require reversal if the reviewing court determines it was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18]; accord, *Neder v. United States* (1999) 527 U.S. 1, 15, 19.)

The record contains overwhelming evidence supporting the finding that at least 10 separate offenses occurred on separate occasions, that defendant "had a reasonable opportunity to reflect upon the [his] actions" within the meaning of Penal Code section 667.6, subdivision (d), and defendant nevertheless chose to continue to commit multiple sexual assaults on M. over a two-year period.

M. testified defendant picked her up from school early on three different days, took her to a hotel and raped her each time. She also testified that the final rape took place on December 5, 2016, when defendant picked her up from soccer practice, parked near a field and forced himself on her in the car. There was corroboration from a school administrator that defendant picked up M. early from school on four different dates in the fall of 2016.

M. testified she was 11 years old when defendant first assaulted her by putting his fingers in her vagina. She said the next time he assaulted her, he used his mouth. She said these types of assaults happened "over and over" at least 10 times during the first year defendant began his abuse and before he started raping her. M. further identified two additional occasions, once when defendant tried to have anal sex with her, and another time when he tried to force himself on her in the bathroom of their home when he was drunk.

25

We have no trouble concluding that if the jury had been asked to make an express finding pursuant to Penal Code section 667.6, subdivision (d), the jury would have found beyond a reasonable doubt that the 10 aggravated assaults on M. occurred on separate occasions within the meaning of the statutory language. Defendant therefore suffered no prejudice by the trial court making that finding.

## DISPOSITION

The judgment of conviction is affirmed.


GRIMES, Acting P. J.

WE CONCUR:


WILEY, J.


HARUTUNIAN, J.*


---

* Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.